```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                      DALLAS DIVISION

CEASAR HANCOCK,                   §
                                  §
              Plaintiff,          §
                                  § Civil Action No. 3:07-CV-1441-D
VS.                               §
                                  §
CHICAGO TITLE INSURANCE           §
COMPANY,                          §
                                  §
              Defendant.          §
```

                     MEMORANDUM OPINION
                        AND ORDER

The instant motion to dismiss presents questions concerning standing and whether the plaintiff has stated a claim under § 8(b) of the Real Estate Settlement Procedures Act ("RESPA") based on the defendant title insurer's alleged failure to discount the premium charged for a reissue title insurance policy and its sharing of the premium with one or more title agents.

                                I

This is an action by plaintiff Cesar Hancock ("Hancock") against defendant Chicago Title Insurance Company ("Chicago Title") arising from Hancock's purchase of a reissue title insurance policy from Chicago Title. Hancock sues to recover for alleged violations of § 8(b) of RESPA, 12 U.S.C. § 2607(b), and on state-law claims for unjust enrichment and money had and received, contending that Chicago Title failed to give him the reissue discount to which he was entitled under Texas law and instead split the amount of the discount with a title agent.

In Texas, mortgage lenders require a borrower to purchase a "lender" title insurance policy as a condition of making a residential loan.[1] The policy insures the lender against certain defects in title to the property, and it remains in effect until the loan is repaid. Lenders also require a borrower to purchase title insurance policies when the homeowners refinance their homes. These are sometimes referred to as "reissue" policies.

The Texas Department of Insurance ("TDI") fixes the premium rates to be charged by title insurance companies. The required rates for an original issue title insurance policy are called the "Basic Rates." TDI has also adopted mandatory rates for reissue lender title policies, and these rates are calculated by using the Basic Rate less the "reissue discount." The reissue discount rate ranges from 40% to 15%, with the rate decreasing as time elapses

---

[1] In deciding Chicago Title's Fed. R. Civ. P. 12(b)(6) motion, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotations omitted) (quoting *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955, 1974 (2007)). "'Factual allegations must be enough to raise a right to relief above the speculative level[.]'" *Id.* (quoting *Bell Atl.*, 127 S. Ct. at 1965). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl.*, 127 S. Ct. at 1964-65 (citations, quotation marks, and brackets omitted).

from the date of the mortgagee policy insuring the prior mortgage. The discount rate is 35% for policies reissued within three years from the date of the mortgagee policy insuring the prior mortgage.

Hancock refinanced his home in March 2007, purchasing a reissue title insurance policy from Chicago Title.  Although the reissue policy was issued within three years of the date of the mortgagee policy insuring the prior mortgage, Chicago Title did not give Hancock the 35% discount required by Texas law.  Chicago Title split the resulting illegal profits with its title agent.

Hancock alleges that Chicago Title's actions violate § 8(b) of RESPA and render it liable on claims for unjust enrichment and money had and received.  Chicago Title moves to dismiss for lack of standing and for failure to state a claim on which relief can be granted.

II

A

The requirement that a plaintiff have standing to sue involves "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  To satisfy the requirements of Article III of the Constitution, Hancock must show, at an "irreducible constitutional minimum," that he has "suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  *Bennett*

*v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Hancock, as "[t]he party invoking federal jurisdiction[,] bears the burden of establishing these elements." *Lujan,* 504 U.S. at 561. "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Id.*

B

Chicago Title maintains that Hancock has not suffered an "injury" that is necessary to establish standing. It offers documents that purport to show that Hancock was not in fact charged more than the statutory maximum for his reissue policy. Hancock disputes this version of the facts and asserts that these documents provide an incomplete picture of the facts. He maintains that Chicago Title overcharged him for the reissue policy and split the proceeds with its title agent.

When standing is challenged, "the trial court is free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Montez v. Dep't of the Navy,* 392 F.3d 147, 149 (5th Cir. 2004). This may be appropriate where "considerations of standing can be severed from a resolution of the merits." *Barrett Comp. Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 220 (5th Cir. 1989). "However, where issues of

fact are central both to [the standing inquiry] and the claim on the merits[,] . . . the trial court must assume jurisdiction and proceed to the merits. *Montez,* 392 F.3d at 150. This is so in part because "[n]o purpose is served by indirectly arguing the merits in the context of federal jurisdiction." *Id.* (internal quotations marks omitted). In such cases, the court must resolve all factual inferences in favor of the plaintiff. *Id.* ("[T]he proper course of action . . . [is to resolve the dispute] under either Rule 12(b)(6) or Rule 56." (internal quotation marks omitted)).

These principles preclude Chicago Title's standing argument. Because it is essential (i.e., "central") to at least some of Hancock's claims on the merits that he show he was charged an excessive premium, the court cannot resolve at this early stage the question whether he was charged such a premium. Accordingly, the court must accept the facts alleged in his complaint and conclude that he has made a sufficient showing of "injury" to satisfy the requirements of Article III standing.[2]

---

[2]Chicago Title's reliance on *Kasprzak v. American General Life & Accident Insurance Co.*, 942 F. Supp. 303 (E.D. Tex. 1996), is misplaced. In *Kasprzak* the plaintiffs conceded that they had not suffered the injury in question. *Id.* at 305 ("[C]ounsel for the [p]laintiffs conceded . . . that the plaintiffs never, in fact, purchased [the defective policies at issue]."). In the present case, Hancock asserts that he *has* suffered the injury that gives rise to this lawsuit. Thus there remains a factual dispute over jurisdiction that, being "intertwined" with the merits, is unfit for resolution at this early stage of the litigation. *See Montez,* 392 F.3d at 150.

III

The court now turns to Chicago Title's motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted.

A

To survive dismissal at the Rule 12(b)(6) stage, Hancock must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S.Ct. 1955, 1974 (2007). Although a complaint does not need detailed factual allegations, Hancock must allege more than "labels," "conclusions," and "formulaic recitation[s] of the elements of a cause of action[.]" *Id.* at 1964-65. The "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.* at 1965. The court must accept all well-pleaded facts as true and view the allegations in the light most favorable to the plaintiff. *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

B

Chicago Title maintains that § 8(b) of RESPA does not afford Hancock relief.

"RESPA seeks to ensure that real estate consumers 'are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive

practices.'" *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (quoting 12 U.S.C. § 2601(a)). In accordance with these objectives, § 8(b) provides that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed." 12 U.S.C. § 2607(b).

The courts of appeals disagree about the precise application of § 8(b) in the context of excessive fees. The Fifth Circuit has not directly addressed the issue. The Fourth, Seventh, and Eighth circuits have concluded that service providers (such as Chicago Title) cannot be held liable to consumer-plaintiffs (such as Hancock) merely for accepting excessive fees from them. *See Haug v. Bank of Am., N.A.*, 317 F.3d 832, 836 (8th Cir. 2003); *Boulware v. Crossland Mortgage Corp.*, 291 F.3d 261, 265-66 (4th Cir. 2002); *Krzalic v. Republic Title Co.*, 314 F.3d 875, 877-79 (7th Cir. 2002). They reason that the word "and" in § 8(b)'s mandate that "no person shall give and no person shall accept" requires that, before there can be a violation, there must be at least one giver and one acceptor who violate the law. *See Haug*, 317 F.3d at 836 ("Section 8(b) . . . unambiguously requires at least two parties to share a settlement fee in order to violate the statute."); *Boulware*, 291 F.3d at 266 ("The use of the conjunctive 'and' indicates that Congress was clearly aiming at an exchange or

transaction, not a unilateral act."). Based on this interpretation of the statute, the courts conclude that to hold providers liable for "accepting" unearned fees from consumers would be absurd, because it would require holding consumers—the ones ostensibly protected by the statute—liable for "giving" premiums to them as well. *See Boulware*, 291 F.3d at 265 ("It would be irrational to conclude that Congress intended consumers to be potentially liable under RESPA for paying unearned fees . . . . [T]he giver in § 8(b) must be some party in the settlement process besides the borrower herself."); *Krzalic*, 314 F.3d at 879 ("On the plaintiffs' understanding, they themselves violated the statute because they gave [the defendant] a portion of the fee charged by the county recorder!"). This interpretation of the statute still allows ample opportunity for recovery. As the *Boulware* court explained, the statute would apply

> where a mortgage lender overcharges a consumer and splits the overcharge with a mortgage service provider, such as a credit reporting agency. In such a case, both the lender/giver and the credit-reporting agency/acceptor would violate § 8(b). In addition, the statute would apply if a mortgage service provider overcharged for its services and gave a mortgage lender a portion of the unearned fee.

*Boulware,* 291 F.3d at 266. Consequently, under the reasoning of these courts, Chicago Title can be held liable only for giving or accepting fees to or from *third-party vendors*—not simply for accepting them from Hancock.

Three recent decisions depart from the *Boulware* line of cases. In *Sosa v. Chase Manhattan Mortgage Corp.*, 348 F.3d 979 (11th Cir. 2003), the Eleventh Circuit agreed that consumers could never be culpable as "givers" of excessive fees, but it disagreed that this would necessarily preclude liability for providers who accept such excessive fees from them (even if they do not give some or all of those fees to a third-party vendor). The *Sosa* court reasoned that "[t]he 'and' in subsection 8(b) . . . operates to create two separate prohibitions . . . . Giving a portion of a charge is prohibited regardless of whether there is a culpable acceptor, and accepting a portion of a charge is prohibited regardless of whether there is a culpable giver." *Id.* at 982.

The Third Circuit explained that this construction of the statute enables Congress to proscribe certain practices that are functionally equivalent to those prohibited under *Boulware,* but not reached under *Boulware*'s reasoning:

> In a kickback arrangement [which would be proscribed by *Boulware*], the consumer would give the settlement service provider $100 for a service, the mortgage service provider would give the third party vendor $100 for that service, and the third party vendor would return $20 to the settlement service provider as a kickback for the referral of service. In [the arrangement allowed by this decision], the consumer still gives the settlement service provider $100 for a service, but the settlement service provider keeps $20 and gives the third party vendor $80 for the service. In both scenarios, the borrower has been charged $100, the settlement service provider has earned $20 for a service it did

- 9 -

>           not provide, and the third party vendor has
>           earned $80 for a service it did provide.

*Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384, 388-89 (3d Cir. 2005).

The Second Circuit has concluded that the statute is ambiguous, and it has deferred to the interpretation proffered by the United States Department of Housing and Urban Development ("HUD"), the agency charged with enforcing the statute. *See Kruse v. Wells Fargo Home Mortgage, Inc.,* 383 F.3d 49, 61 (2d Cir. 2004) ("[W]e accord *Chevron* deference to HUD with respect to its analysis of the application of section 8(b) to markups."). Because HUD gives the same construction to the statute as do *Sosa* and *Santiago*, the Second Circuit—like the Third and Eleventh Circuits—holds that a provider can be held liable for receiving unearned fees from a consumer. *See id.* at 57.

These courts stop short, however, of holding that providers will *always* be liable for receiving unearned fees from consumers. *Santiago* and *Kruse* both distinguish what they consider to be mere "overcharges" from actionable "mark-ups." Mark-ups occur when "the provider outsources the task of providing the service to a third-party vendor, pays the vendor a fee for the service, and then, without providing an additional service, charges homeowners seeking mortgages a higher fee for the settlement service than that which the provider paid to the third-party vendor." *Kruse,* 383 F.3d at 53. An "overcharge," by contrast, occurs where the

defendant charges the plaintiff an excessive fee for services that the defendant itself performed. *Id.* at 53. These courts conclude that the statute does not allow recovery for mere overcharges, because the defendant has actually performed some services in such cases. Accordingly, allowing liability

> would require dividing charges for [these] services . . . into 'reasonable' and 'unreasonable' portions . . . . [This is significant because] there is no . . . language in the body of the statute that instructs how to define the reasonable and unreasonable portions of a charge . . . [and it] would be unusual for Congress to provide for treble damages for "unreasonable" charges without any definition of "unreasonable."

*Santiago,* 417 F.3d at 387; *see also Kruse,* 383 F.3d at 56 ("[N]othing in [§ 8(b)] authorizes courts to divide a 'charge' into what they or some other person or entity deems to be its 'reasonable' and 'unreasonable' components . . . . It would, moreover, be an odd reading of the statute to conclude that it instructs federal courts to award treble damages, see RESPA § 8(d)(2), 12 U.S.C. § 2607(d)(2), for 'unreasonable' charges made by financial institutions without giving those courts so much as a hint as to how to differentiate between what is and is not 'reasonable.'").

C

Although the *Boulware* line of cases takes a more restrictive approach to § 8(b) with respect to whether providers can be held liable for receiving unearned fees from *consumers* (who cannot be

culpable "givers"), the circuits appear to agree that a provider can be liable when it gives unearned fees to a *third party vendor*, such as a title agent. *See Boulware,* 291 F.3d at 266 ("[T]he provision would clearly apply to situations where a mortgage lender overcharges a consumer and splits the overcharge with a mortgage service provider."). The court concludes that Hancock has on this basis stated a claim on which relief can be granted. He has alleged that Chicago Title split the proceeds of a title reissue policy with its title agent, who performed no services. Am. Compl. ¶¶ 15, 40, and 43 (alleging that Chicago Title illegally split unearned premium with Madison Settlement Services, LLC and/or Fidelity National Agency Solutions by, *inter alia*, giving a portion, split, or percentage of a charge other than for services actually rendered); *see, e.g., Mims v. Stewart Title Guar. Co.,* 521 F.Supp.2d 568, 572–73 (N.D. Tex. 2007) (Godbey, J.).

Chicago Title maintains that it can avoid liability because *it* performed some services for the fees it gave its title agent. But to state a claim under § 8(b), Hancock need only adequately plead that Chicago Title gave a portion of a charge to its title agent for a real estate settlement service that *the title agent* did not perform. This is because § 8(b) liability can apply where a person "give[s] . . . any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed." 12 U.S.C. §

2607(b). In fact, this fits within the classic definition of a kickback that RESPA intends to prevent. The giver actually provides a service, but to get the consumer's business, the giver pays a kickback to an acceptor who provides the consumer no "services actually performed." Because Hancock is relying on a giver-liability theory to sue Chicago Title—i.e., for *giving* a portion of the reissue policy premium to a title agent "other than for services actually performed," and not for *receiving* fees for services that Chicago Title did not perform, Hancock need not plead that Chicago Title failed to provide necessary services.

The court need not decide at this stage of the litigation what is the appropriate standard for determining whether the title agent "actually performed" services that would justify receipt of the funds. The parties have not fully briefed the issue, and the record of services provided by the title agent has not been developed. For now, it is sufficient to hold that Hancock's complaint may be plausibly read to assert that the agent performed *no* services that would justify the fees under *any* standard.[3]

---

[3]The court's decision today is intended to address the arguments raised in Chicago Title's Rule 12(b)(6) motion as they relate to the specific allegations of Hancock's amended complaint, and not to speak broadly about the appropriate use of RESPA or whether, after further development of the record, the court will or will not conclude that RESPA applies in this context.

D

In addition to raising a claim against Chicago Title based on its *giving* of unearned fees, Hancock's complaint appears to raise a claim based on Chicago Title's *receipt* of unearned fees from Hancock. As discussed, the *Boulware* line of cases would foreclose such a claim. The *Sosa* line of cases, on the other hand, allows a claim based on a provider's receipt of fees from a consumer, but only in certain circumstances. The court will not now decide whether and under what circumstances such a claim would be cognizable under Fifth Circuit law. Without a more fully developed record, it would be imprudent to attempt to resolve these unsettled issues. This principle applies in the summary judgment context. *See Black v. J.I. Case Co.*, 22 F.3d 568, 572 (5th Cir. 1994) (noting that "even in the absence of a factual dispute, a district court has the power to 'deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial'" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *Marcus v. St. Paul Fire & Marine Ins. Co.*, 651 F.2d 379, 382 (5th Cir. Unit B July 1981) (holding that "a district judge can . . . deny a Rule 56 motion [for summary judgment] that may be justifiable under the rule, if policy considerations counsel caution."). *A fortiori*, it applies when deciding an unsettled legal issue in the Rule 12(b)(6) context that may be impacted by underlying facts that must be developed through discovery.

E

Chicago Title also argues that there is no private cause of action for a violation of the Texas Title Insurance Act, Tex. Ins. Code Ann. §§ 2501.001 *et seq.* (Vernon Pamp. Supp. 2007) ("TTIA"). Assuming *arguendo* that this is true, it is not controlling. Hancock has not attempted to assert a cause of action under the TTIA, but only alleges causes of action for money had and received, unjust enrichment, and violations of RESPA. Chicago Title cites no authority for the proposition that the mere absence of a cause of action under the TTIA would itself foreclose these other claims.[4] Accordingly, its motion to dismiss on these grounds is denied.

\* \* \*

For the reasons set out, Chicago Title's October 2, 2007 motion to dismiss is denied.

**SO ORDERED.**

February 5, 2008.

                                      _/s/ Sidney A. Fitzwater_
                                      SIDNEY A. FITZWATER
                                      CHIEF JUDGE

---

[4]Chicago Title maintains for the first time in its reply brief that the Texas Legislature intended the administrative remedies available under the TTIA to be exclusive. The court will not consider new arguments raised in Chicago Title's reply brief. *See, e.g., Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*, 749 F.Supp. 758, 772 (N.D. Tex. 1990) (Fitzwater, J.).