IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CEASER HANCOCK and EMMA BENAVIDES, individually and on behalf of all others similarly situated, | § § § § § | |
| Plaintiffs, | § § | |
| VS. | § § § | Civil Action No. 3:07-CV-1441-D |
| CHICAGO TITLE INSURANCE COMPANY, | § § § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

In this putative class action arising from a title insurer's alleged failure to discount premiums charged for reissue title insurance policies and its alleged sharing of premiums with title agents, the court must decide whether the title insurer is entitled to summary judgment dismissing claims brought under § 8(b) of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607(b), and under Texas law.  For the reasons that follow, the court dismisses plaintiffs' claims under RESPA § 8(b) and for unjust enrichment, and it otherwise denies the title insurer's summary judgment motions.

I

Plaintiffs Ceaser Hancock ("Hancock") and Emma Benavides ("Benavides") bring this putative class action against defendant Chicago Title Insurance Company ("Chicago Title").  Their claims center on Chicago Title's alleged failure to discount premiums

charged for reissue title insurance policies and its alleged sharing of the premiums with title agents.   Plaintiffs allege claims for violations of RESPA § 8(b), and they assert state-law claims for unjust enrichment, money had and received, and breach of implied contract.

Hancock and Benavides, each of whom purchased a reissue title insurance policy, allege that Chicago Title failed to give them the reissue discount to which they were entitled under Texas law and instead split the amount of the discount with a title agent.[1]   In Texas, mortgage lenders require a borrower to purchase a lender title insurance policy as a condition of making a residential loan. The policy insures the lender against certain defects in title to the property, and it remains in effect until the loan is repaid. Lenders also require borrowers to purchase title insurance policies when homeowners refinance their homes.   These are sometimes referred to as "reissue" policies.

The Texas Department of Insurance ("TDI") sets the premium rates that title insurance companies can charge.   The rates for original issue title insurance policies are called the "Basic Rates."   TDI has also adopted mandatory rates for reissue title

---

[1]The court recounts the evidence in a light favorable to plaintiffs as the summary judgment nonmovants and draws all reasonable inferences in their favor.   *E.g.*, *Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

insurance policies, and these rates are calculated by using the Basic Rate less the "reissue discount."  The reissue discount ranges from 40% to 15%, with the rate decreasing as time elapses from the date of the mortgagee policy insuring the prior mortgage. The discount rate is 40% for policies reissued within two years of the date of the mortgagee policy insuring the prior mortgage, and it is 35% for policies reissued within three years.

Hancock refinanced his home in March 2007, purchasing a reissue title insurance policy from Chicago Title.  Although the reissue policy was issued within three years of the date of the mortgagee policy insuring the prior mortgage, Hancock alleges that Chicago Title did not give him the 35% discount required by Texas law.  He asserts that Chicago Title split the resulting illegal profits with its title agent.  Benavides refinanced her home in May 2007, and purchased a reissue title insurance policy from Chicago Title.  The policy was issued within two years of the date of the mortgagee policy insuring her prior mortgage, thus she was entitled to a 40% discount under Texas law.  Benavides alleges that Chicago Title failed to give her the discount, and that it instead split the premium with its title agent.  Hancock and Benavides sue Chicago Title under RESPA and Texas law.

Hancock filed suit in August 2007. Chicago Title moved to dismiss under Fed. R. Civ. P. 12(b)(6), and the court denied the motion.  *Hancock v. Chi. Title Ins. Co.*, 2008 U.S. Dist. LEXIS

8621, at *8-*17 (N.D. Tex. Feb. 5, 2008) (Fitzwater, C.J.) ("*Hancock I*"). Chicago Title then moved for summary judgment in July 2008.[2] In September 2008 the court permitted Benavides to intervene as a class representative. At the time, Benavides was pursuing nearly identical claims against Chicago Title in a suit she had filed in the Western District of Texas, and she and Hancock were represented by the same counsel. Benavides' case was transferred to this court and consolidated with Hancock's case in December 2008. Before the suit was transferred, Chicago Title filed a summary judgment motion in Benavides' case. Consequently, there are two pending summary judgment motions. Because the issues and arguments presented in both are substantially similar, except as noted below,[3] the court will address them together.

---

[2]Chicago Title filed without leave of court a supplemental appendix in support of its summary judgment motion. After the court issued an order holding that it would not consider the supplemental appendix, Chicago Title moved for leave. Because the evidence in the supplemental appendix does not affect today's decision, the court denies as moot Chicago Title's December 5, 2008 motion for leave to file supplemental appendix in support of summary judgment reply *nunc pro tunc*.

[3]In the final section of this memorandum opinion and order, the court considers Chicago Title's arguments pertaining specifically to the situation surrounding Hancock's alleged overcharge. *See infra* IX.

II

Chicago Title moves for summary judgment dismissing plaintiffs' RESPA claims, contending that plaintiffs have not adduced evidence that supports a finding that it violated RESPA § 8(b). Plaintiffs allege that Chicago Title charged more than Texas law allows for title insurance and then split the excessive charges with its title agents. Chicago Title maintains that, because both it and its title agents actually performed services in connection with issuing the title insurance policies, plaintiffs' allegations constitute mere overcharge claims that are not actionable under RESPA § 8(b).

Preliminarily, the court notes that the issue presented by Chicago Title's summary judgment motions is distinct from the ones that the court addressed in *Hancock I*. In *Hancock I* the court concluded under the Rule 12(b)(6) standard that Hancock had stated a claim under RESPA § 8(b) because he had adequately pleaded that Chicago Title had given a portion of a charge to its title agent for a settlement service that the title agent did not perform. *Hancock I*, 2008 U.S. Dist. LEXIS 8621, at *15-*17. The court explicitly declined to address whether the title agent had "actually performed" services that justified its fee. *Id.* at *16. It held that, "[f]or now, it is sufficient to hold that Hancock's complaint may be plausibly read to assert that the agent performed *no* services that would justify the fees under *any* standard." *Id.*

- 5 -

at *17.   The court noted that its decision was only intended to
address arguments raised in the Rule 12(b)(6) motion, and "not to
speak broadly about the appropriate use of RESPA or whether, after
further development of the record, the court will or will not
conclude that RESPA applies in this context." *Id.* at *17 n.3.

But at the summary judgment stage, Chicago Title is not
confined to the allegations of plaintiffs' complaints.   And it is
undisputed that both Chicago Title and its title agents actually
performed the services for which they charged plaintiffs.   Chicago
Title underwrote and assumed the risk of the title insurance
policies, and the title agents evaluated the title searches to
determine insurability, cleared title requirements, issued the
title commitments, and issued the final title insurance policies.
Plaintiffs do not dispute that Chicago Title and its title agents
performed these services.   Nor do plaintiffs contest that these are
the services for which they paid premiums.

Plaintiffs allege that, because they were not given the
reissue discount and were charged more than what Texas law allows,
neither Chicago Title nor its title agents performed services *for*
*the part of the charges that exceeds the allowable rate.*
Specifically, Hancock asserts that he paid $1,061.35 for his title
insurance policy and was not given a reissue discount of $333.20,

to which he was entitled under Texas law.[4]  Hancock reasons that no
services were performed for the $333.20 that should have been
discounted.  Likewise, Benavides posits that she paid $1,329.20 for
her title insurance policy and was not given a mandatory $370.40
reissue discount.[5]  She likewise maintains that no services were
actually performed for the $370.40 that should have been
discounted.  Plaintiffs assert that Chicago Title and its title
agents split the premiums, which included money that should have
been discounted.  They contend that these alleged facts, when
presumed to be true, constitute a violation of RESPA § 8(b).

Whether the alleged fact scenario can trigger liability under
RESPA § 8(b) is a legal issue.  Because it is undisputed that
Chicago Title and its title agents actually performed the services
for which they charged plaintiffs, there are no material fact
issues that prevent the court from addressing the legal issue
presented by the motions for summary judgment.  The specific issue
the court must now decide is whether charging more for title
insurance than state law allows, when the charge is split between
a title insurer and title agent who each performed services in

---

[4]The court recognizes that $333.20 is not 35% of $1,061.35,
but this is the amount of the reissue discount to which Hancock
alleges he is entitled.  The court therefore will use these figures
in this memorandum opinion and order.

[5]These are the figures that Benavides uses in her summary
judgment briefing.  They vary from the figures she alleges in the
second amended complaint.

connection with the issuance of the title insurance, violates RESPA § 8(b).

### III

### A

Congress enacted RESPA "to protect consumers from unnecessarily high settlement charges and abusive mortgage practices." *Moreno v. Summit Mortgage Corp.*, 364 F.3d 574, 576 (5th Cir. 2004) (citing 12 U.S.C. § 2601).  In particular, § 8 of RESPA prohibits kickbacks, referral fees, and unearned fees. *See* 12 U.S.C. § 2607; *Moreno*, 364 F.3d at 576.  Section 8(b) provides that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service . . . other than for services actually performed." 12 U.S.C. § 2607(b).

The scope and application of § 8(b) have been widely debated. Although courts have not been uniform in their application of § 8(b), they agree that RESPA is not a price-control statute.[6]

---

[6]Although the Fifth Circuit has not directly addressed this issue, all the circuits that have decided this question have reached this conclusion. *See, e.g.*, *Friedman v. Market St. Mortgage Corp.*, 520 F.3d 1289, 1296 (11th Cir. 2008) (holding that § 8(b) "does not govern excessive fees because it is not a price control provision"); *Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49, 57 (2d Cir. 2004) (holding that "Congress did not intend section 8(b) to serve as a price-control mechanism"); *Krzalic v. Republic Title Co.*, 314 F.3d 875, 881 (7th Cir. 2002) ("[RESPA] is not a price-control statute."); *Boulware v. Crossland Mortgage Corp.*, 291 F.3d 261, 265 (4th Cir. 2002) (concluding that "§ 8(b) is not a broad price-control provision").  Judges of this court have reached the same conclusion. *See Hamilton v. First Am. Title*

They also agree that § 8(b) does not impose liability for mere overcharges. *See, e.g.*, *Friedman v. Market St. Mortgage Corp.*, 520 F.3d 1289, 1296 (11th Cir. 2008) ("As with the Second, Third, Fourth, Seventh, and Eighth Circuits, we hold that subsection 8(b) does not govern excessive fees because it is not a price control provision." (citing cases)); *Santiago v. GMAC Mortgage Group, Inc.*, 417 F.3d 384, 388 (3d Cir. 2005) (holding that "Section 8(b) does not include a cause of action for overcharges"); *Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49, 56 (2d Cir. 2004) ("We conclude that section 8(b) clearly and unambiguously does not extend to overcharges."). An "overcharge" occurs where a settlement service provider charges a consumer an excessive fee for a settlement service that it actually performed.[7] *See, e.g.,*

---

*Co.*, 612 F.Supp.2d 743, 746 (N.D. Tex. 2009) (Fish, J.) (holding that "RESPA § 8(b) was not intended to be a price control provision); *Mims v. Stewart Title Guar. Co.*, 521 F.Supp.2d 568, 572 (N.D. Tex. 2007) (Godbey, J.) ("Although the Fifth Circuit has not directly addressed the issue, it is widely acknowledged that section 8(b) is not a broad price-control provision." (internal quotation marks and citations omitted)).

[7]An overcharge is distinct from a "mark-up," which occurs "when the provider outsources the task of providing the service to a third-party vendor, pays the vendor a fee for the service, and then, without providing an additional service, charges homeowners seeking mortgages a higher fee for the settlement service than that which the provider paid to the third-party vendor." *Kruse*, 383 F.3d at 53. Although these terms are uniformly used today, *Boulware*, one of the earlier cases to address these issues, refers to as an "overcharge" what this court has defined as a "mark-up." *See Boulware*, 291 F.3d at 264-66. There is disagreement in the circuits about whether mark-ups are actionable under § 8(b), but this is immaterial here because plaintiffs do not allege facts that could support a mark-up claim.

*Kruse*, 383 F.3d at 53.  Such an overcharge is not a violation of § 8(b) because, even though excessive, the charge is *for* services actually performed.  *See id.* at 56 ("Whatever its size, such a fee is 'for' the services rendered by the institution and received by the borrower.").  To apply § 8(b) to overcharges "would require dividing charges for services provided into 'reasonable' and 'unreasonable' portions——that is, the portion for 'services rendered' and the portion for 'no services rendered.'" *Santiago*, 417 F.3d at 387.  Courts have eschewed a reading of § 8(b) that would require the parsing of a single charge into multiple parts. *See id.* (characterizing such a reading as "absurd"); *Kruse*, 383 F.3d at 56 (holding that nothing in the language of § 8(b) "authorizes courts to divide a 'charge' into what they or some other person or entity deems to be its 'reasonable' and 'unreasonable' components").  It is therefore accepted that the inquiry under RESPA § 8(b) is not whether a charge or portion of a charge is excessive, but whether it is given and received for services actually performed.

B

Chicago Title contends that, because it and its title agents performed actual services for the fees they received, RESPA § 8(b) cannot impose liability.  It argues that, no matter how plaintiffs attempt to portray the facts, all they have alleged is an

overcharge, which is not actionable under § 8(b).

Plaintiffs attempt to distinguish this lawsuit from a simple overcharge case in two ways.  First, they maintain that, as a matter of state law, Chicago Title could not have performed any services justifying the portion of the fees that should have been discounted.  Second, they contend that their claims are distinguishable because Chicago Title split the fees with its title agents.

1

Plaintiffs contend that no services were provided for the portion of the premium that exceeded the rate set by Texas law.  To distinguish their case from an overcharge claim, plaintiffs urge the court to interpret the excess portion as a separate charge from the premium permitted by law.  For example, using the $1,061.35 premium that Hancock paid, plaintiffs characterize the $333.20 that should have been deducted as a reissue discount and the $728.15 that Hancock should have been charged as separate charges.

To characterize the premium in this manner, however, requires the parsing of a single charge into multiple parts, which courts have refused to do under § 8(b).  *See, e.g., Santiago*, 417 F.3d at 387; *Kruse*, 383 F.3d at 56.  Chicago Title did not in fact charge Hancock $728.15 for certain services and charge him $333.20 for others.  It charged a premium of $1,061.35 for all of the services that went into providing title insurance policies, but it failed to

credit Hancock the $333.20 reissue discount.

Plaintiffs maintain that their theory does not require that a single charge be parsed into multiple components. Presumably, they reason that Texas law has effectively done so. But this begs the question whether state law can transform an alleged overcharge into an unearned fee that violates RESPA. The court holds that it cannot. Although under Texas rate rules the excess portion of the premium can be precisely calculated, it does not follow that the excess portion is a charge made or received "other than for services actually performed." 12 U.S.C. § 2607(b); *see also Mims v. Stewart Title Guar. Co.*, 521 F.Supp.2d 568, 573 (N.D. Tex. 2007) (Godbey, J.) (stating that "an overcharge is not transformed into a violation simply because it is easy to calculate"); *Williams v. Saxon Mortgage Servs., Inc.*, 2007 WL 1845642, at *5 n.12 (S.D. Ala. June 25, 2007) (holding that, although state law may be a "handy tool to distill the reasonable portion from the excessive portion of the charge," it "does not establish the propriety of performing such a distillation process in the first place"). As the Eleventh Circuit held when it considered plaintiffs' state law argument, "[e]ven if the excess portion of the premium was arguably 'unearned' as a matter of [state] law, as a factual matter it was not in exchange for nothing." *Hazewood v. Found. Fin. Group, LLC*,

551 F.3d 1223, 1226 (11th Cir. 2008) (per curiam).[8]   All of the premiums paid by plaintiffs, including the excessive portions, were exchanged for services actually performed.

Adopting plaintiffs' theory would effectively turn § 8(b) into a price-control provision, which courts have consistently held it is not.  *See supra* n.6.  Moreover, application of § 8(b) would vary depending on each state's title insurance regulations.   Not all states set the rates that title insurers can charge for title insurance as does Texas.   There is no indication that Congress intended § 8(b) to provide a federal remedy for violations of some of the states' price control regulations.  *See Hazewood*, 551 F.3d at 1226.   Accordingly, the court refuses, based solely on a state's rate rules, to parse a premium paid for a title insurance policy into one portion that is for actual services and another that is not.

2

The fact that Chicago Title split the excessive premiums with its title agents does not of itself convert the overcharges into violations of RESPA.   Section 8(b) only proscribes giving and

---

[8]In a June 22, 2009 motion for leave to file notice of supplemental authority, Chicago Title seeks leave to bring to the court's attention and argue the effect of a recent Fourth Circuit decision.  *See Arthur v. Ticor Title Ins. Co. of Fla.*, ___ F.3d ___, 2009 WL 1703151 (4th Cir. June 18, 2009).   Chicago Title maintains that *Arthur* lends further support to this conclusion. Because *Arthur* is consistent with today's opinion, the court grants Chicago Title leave to submit this supplemental authority without awaiting an opposition response to the motion.

receiving a split of a charge when the split is being given or
received "other than for services actually performed." 12 U.S.C.
§ 2607(b); *see also* § 2607(c) (providing that § 8 does not prohibit
"the payment of a fee . . . by a title company to its duly
appointed agent for services actually performed in the issuance of
a policy of title insurance"). Thus the critical inquiry remains
whether the split is given and received for services actually
performed. *See Mims*, 521 F.Supp.2d at 572 ("Merely adding the fact
that [the title insurer] paid a portion of the excessive premiums
to title agents does not transform the overcharges into violations.
Rather, the portion accepted by the title agents must have been
other than 'for services actually performed,' such that the portion
would be in the nature of a kickback or referral fee.").

Plaintiffs' contention that the split in this case constitutes
a violation of § 8(b) relies on the parsing that the court has
already rejected. They reason that, because the premium itself
included an excessive portion, a component of the title agent's
split was also excessive. Plaintiffs do not allege that Chicago
Title gave all of the reissue discount amount to its title agent,
or even that it gave a distinct part of the discount to its title
agent. They merely assert that Chicago Title and its title agent
split the entire premium, which included the reissue discount. But
plaintiffs have proffered no evidence suggesting that the title
agents' splits were not given and received solely for the services

they performed, or that the splits were in the nature of kickbacks or referral fees.  Because it is undisputed that both Chicago Title and its agents actually performed services relating to the issuance of plaintiffs' title insurance policies, these allegations do not establish violations of RESPA.  The only conclusion that the evidence allows is that Chicago Title received its components of the premium payments and that the title agents received their portions *for* services that they actually performed.

3

Plaintiffs urge the court to defer to a 2001 policy statement issued by the U.S. Department of Housing and Urban Development ("HUD").  *See* RESPA Statement of Policy 2001-1, 66 Fed. Reg. 53052 (Oct. 18, 2001) ("Policy Statement").  They posit that HUD construes § 8(b) to impose liability in this case.  In its much-debated, and oft-rejected, policy statement, HUD interprets § 8(b)'s proscription of unearned fees to apply where:

> (1) Two or more persons split a fee for settlement services, any portion of which is unearned; or (2) one settlement service provider marks-up the cost of the services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or (3) one service provider charges the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed.

*Id.* at 53059.  Plaintiffs explicitly rely on the first numbered

- 15 -

provision: where persons split a settlement service fee, "any portion of which is unearned." *Id.*

On its face, provision (1) applies to the traditional kickback arrangement, in which a person gives or receives a portion of a split other than for services actually performed. It is not obvious, however, that it would apply where two persons divide a fee for which they both performed actual services. For plaintiffs' allegations to fall under provision (1), it would be necessary for the court to parse the premium Chicago Title charged plaintiffs into an "earned" portion coinciding with the amount Chicago Title should have charged under the Texas rate rules and an "unearned" portion coinciding with the amount of the reissue discount. In other words, an overcharge would have to be interpreted as an "unearned fee" that violates § 8(b). Although it is not evident from the face of provision (1), other portions of the policy statement, including provision (3), make clear that HUD does consider an overcharge to be a violation of § 8(b). *See id.* Therefore, the court agrees with plaintiffs that, according to the HUD policy statement, the facts alleged in this case would be a violation of RESPA § 8(b). This conclusion, however, does not end the inquiry.

Courts are not obligated to defer automatically to an agency's construction of a statute. The process for determining whether to give deference to HUD's interpretation of § 8(b) is outlined in

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).   The court must first consider whether Congress has directly spoken to the question at issue.   *See Chevron*, 467 U.S. at 842.   "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."   *Id.* at 842-43.   If the court determines that the statute and Congress' intent are ambiguous as to the issue, it should, in most cases, defer to the agency's interpretation unless it is arbitrary and capricious.   *Id.* at 843-44.

The circuit courts have consistently refused to defer to HUD's position that RESPA § 8(b) applies to overcharges, holding that it is at odds with the unambiguous text of § 8(b).   *See, e.g.*, *Friedman*, 520 F.3d at 1297 (concluding that the plain language of § 8(b) precludes HUD's interpretation); *Santiago*, 417 F.3d at 387-88 (holding that, "because the plain language of Section 8(b) does not provide for a cause of action for overcharges, it is not necessary for us to reach the question whether HUD's interpretation warrants deference"); *Kruse*, 383 F.3d at 56-57 (refusing to defer to HUD's position on overcharges and concluding that "section 8(b) clearly and unambiguously does not extend to overcharges").[9]   A

---

[9]Plaintiffs contend that their arguments are supported by the Second Circuit's analysis in *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111 (2d Cir. 2007).   *Cohen*, however, addresses the applicability of RESPA § 8(b) to a post-closing fee for which no services were performed.   *See Cohen*, 498 F.3d at 115-16.   *Cohen*

district court has also refused to defer to the HUD policy
statement in several cases that are similar to the present one,
holding that it is contrary to the plain language of RESPA § 8(b).[10]
*See Hazewood*, 2007 WL 1975446, at *3 (S.D. Ala. July 2, 2007),
*aff'd*, 551 F.3d 1223, 1226 (11th Cir. 2008) (per curiam); *Williams*,
2007 WL 1845642, at *6; *Morrisette v. NovaStar Home Mortgage, Inc.*,
484 F.Supp.2d 1227, 1229-30 (S.D. Ala. 2007).  And in *Kingsberry v.
Chicago Title Insurance Co.*, 586 F.Supp.2d 1242 (W.D. Wash. 2008),
counsel presented the same arguments as those raised here.  The
*Kingsberry* court refused to defer to provision (1) of the HUD
policy statement, holding that the court's "reading of the statute
forces it to the conclusion that Section 8(b) is not a price
control statute and that any splitting of a unitary fee into
'reasonable' and 'unreasonable,' 'earned' and 'unearned' portions
would convert the statute into something the legislature never
intended."  *Id.* at 1246.

     This court's reading of § 8(b) is consistent with how other
courts have interpreted it.  The court concludes that the statute

---

distinguishes that situation from those in which a settlement
service provider overcharges for services actually performed, and
it explains that *Kruse*'s holding remains valid in overcharge cases.
*See id.*

     [10]Plaintiffs argue that these cases are inapposite because they
do not explicitly address provision (1) of the policy statement,
but instead focus on the title insurer's overcharge.  As the court
has discussed, however, for plaintiffs' allegations to fall under
provision (1), Chicago Title's overcharge must be interpreted as an
unearned fee.

is clearly inapplicable where, as here, a title insurer charges a premium that exceeds the amount mandated by state law and then pays part of the premium to a title agent for services the title agent actually performed.  RESPA § 8(b) prohibits giving and accepting any split of a charge made or received "other than for services actually performed." 12 U.S.C. § 2607(b).  A reasonable jury could only find that the premiums plaintiffs paid, and that Chicago Title either kept or distributed to its title agents, were *for* services actually performed.  To conclude that they were not requires parsing them further into earned and unearned portions based on Texas price-control regulations.  Although HUD may advocate this approach, it is not authorized under the language of RESPA § 8(b).

4

Although plaintiffs do not rely on or discuss *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732 (5th Cir. 2003), the court will address it because, in *O'Sullivan*, the Fifth Circuit deferred to HUD's interpretation of RESPA § 8(c).

*O'Sullivan* involved a class certification appeal.  *Id.* at 735. The plaintiffs alleged that a mortgage broker violated RESPA § 8(a)-(b) by accepting kickbacks from law firms.  *Id.*  The law firms prepared certain closing documents for the mortgage broker. *Id.* at 736.  At closing, plaintiffs paid the law firms for preparing the documents, and the firms then reimbursed part of the fee to the mortgage broker.  *Id.*  Although the plaintiffs conceded

that the broker performed some services in connection with the document preparation, they argued that the reimbursements were really kickbacks because they did not represent the reasonable value of the services. *Id.* at 741. The broker countered that the reimbursement was permissible under § 8(c)(2), which permits "the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed." 12 U.S.C. § 2607(c)(2).

In determining whether class certification was proper, the Fifth Circuit considered 24 C.F.R. § 3500.14(g)(2), the HUD regulation concerning the RESPA § 8(c) exception, which prescribes a reasonable relationship test for discerning kickbacks. Under 3500.14(g)(2), "[i]f the payment of a thing of value bears no reasonable relationship to the market value of the goods or services provided, then the excess is not for services or goods actually performed or provided." 24 C.F.R. § 3500.14(g)(2). It also provides that "[t]hese facts may be used as evidence of a violation of section 8 and may serve as a basis for a RESPA investigation." *Id.* The Fifth Circuit deferred to the HUD regulation "insofar as it provides a mechanism for detecting kickbacks where the § 8(c) exception is invoked." *O'Sullivan*, 319 F.3d at 740. It also stated that it looked to the HUD policy statements "insofar as they express the reasonable relationship test as a two-part inquiry, asking first whether [the broker]

provided goods or services in connection with the particular transaction, and second, whether [the broker's] compensation is reasonably related to the value of those goods or services."[11] *Id.* at 741.[12]

Although this court acknowledges that the Fifth Circuit deferred to HUD in *O'Sullivan*, it concludes that *O'Sullivan* does not support, much less require, deferring to HUD in the present case.[13] *O'Sullivan* focused on HUD's reasonable relationship test, and it deferred to it "insofar as it provides a mechanism for detecting kickbacks where the § 8(c) exception is invoked." *Id.* at 740. Plaintiffs do not rely on or discuss HUD's reasonable relationship test. They do not allege that the fees Chicago Title gave to its title agents were not reasonably related to the actual value of the services the agents actually performed. Indeed, plaintiffs assert that "the reasonable value of the services here [is] not implicated." Hancock Oct. 30, 2008 Br. 42; *see also*

_____

[11]The Fifth Circuit explicitly stated that it was not deciding whether the HUD policy statements were entitled to *Chevron* deference. *O'Sullivan*, 319 F.3d at 741.

[12]The Fifth Circuit held that it was error to grant class certification because individual issues predominated. *Id.* at 742.

[13]In the context of RESPA, it is not uncommon for circuits to defer to some of HUD's positions while simultaneously refusing to defer to others. For example, although HUD posits that § 8(b) prohibits both overcharges and markups, several circuits have deferred to HUD's markups position while refusing to apply § 8(b) to overcharges. *See, e.g.*, *Santiago*, 417 F.3d at 387-89; *Kruse*, 383 F.3d at 55-62.

Benavides Feb. 5, 2009 Br. 30 (same). Furthermore, plaintiffs' allegations depend on Chicago Title's alleged overcharge of consumers. Such overcharges raise fundamentally different issues than does the law firm's alleged kickback in *O'Sullivan*. Applying HUD's reasonable relationship test to the alleged overcharge of a consumer turns RESPA into a price-control provision, a function that is not at issue in *O'Sullivan*. Additionally, *O'Sullivan* is primarily concerned with § 8(c)(2), and the opinion does not analyze the language of § 8(b), on which the court bases its decision in this case. *O'Sullivan* is distinguishable based on different facts, different arguments, and different regulatory provisions. Moreover, extending *O'Sullivan*'s analysis to overcharges would place the Fifth Circuit at odds with all of the circuits that have considered the precise issue.

5

Plaintiffs briefly contend that recent opinions of this court support the viability of their RESPA claims. Several cases with similar claims have been brought in this court. *See Hamilton v. First Am. Title Co.*, 612 F.Supp.2d 743, 746 (N.D. Tex. 2009) (Fish, J.); *Villafranca v. Ticor Title Ins. Co.*, No. 3:08-CV-0118-K (N.D. Tex. July 22, 2008) (Kinkeade, J.); *Mims*, 521 F.Supp.2d 568; *Patino v. Lawyers Title Ins. Corp.*, 2007 WL 4687748 (N.D. Tex. Jan. 11, 2007) (Boyle, J.). None of the opinions that plaintiffs cite, however, addresses a motion for summary judgment. Like *Hancock I*,

they address motions to dismiss under the Rule 12(b)(6) standard, which requires that a plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   More important, and as in *Hancock I*, all of these opinions address allegations that the title agents did not receive their fees for services they actually performed.[14]   *See Hamilton*, 612 F.Supp.2d at 746-47 ("[T]he plaintiffs have pled that the defendant charged a fee it did not earn, and then split that fee with the title agent, who had performed no services in connection with that fee."); *Mims*, 521 F.Supp.2d at 571-72 (holding that plaintiffs' vague allegations could be fairly read to assert that "[t]he portion[s] accepted by the title agents were excessive and not 'for services actually performed,' but instead were in the nature of kickbacks or referral fees"); *Patino*, 2007 WL 4687748, at *6 ("Looking solely at the allegations in [the plaintiff's] complaint, it is unclear whether and/or to what extent either [the title insurer] or the title agents, with whom the alleged 'illegal' overcharge was shared, actually performed services in connection with the issuance of the title insurance policy for [plaintiff's] new mortgage.").   In the present case, the factual record has now been developed, and it is

---

[14]The court addresses the *Hancock I* holding *supra* at § II.   The court based its opinion on Hancock's allegation "that Chicago Title split the proceeds of a title reissue policy with its title agent, who performed no services." *Hancock I*, 2008 U.S. Dist. LEXIS 8621, at *15.

undisputed that both Chicago Title and its title agents performed actual services in exchange for the fees they received. The procedural posture of this case, and the pertinent issues and arguments, distinguish this suit from the ones on which plaintiffs rely.[15]

The decisions that are apposite to this case hold that § 8(b) does not impose liability. *See, e.g.*, *Arthur v. Ticor Title Ins. Co. of Fla.*, ___ F.3d ___, 2009 WL 1703151, at *2-*5 (4th Cir. June 18, 2009); *Hazewood*, 551 F.3d at 1226-27; *Kingsberry*, 586 F.Supp.2d at 1246-47; *Williams*, 2007 WL 1845642, at *5-*6. In fact, counsel for Hancock and Benavides made nearly identical allegations and arguments in *Kingsberry*, in which the court held that § 8(b) does *not* impose liability. In *Kingsberry* the court wrote:

> The issue before this Court is whether an excessive fee, split between service providers who each performed *some* work in connection with the service for which the fee was charged, constitutes a violation of RESPA. On this issue the statute is clear and

---

[15]The court acknowledges that *Mims* and *Hamilton*, relying on *O'Sullivan*, endorse the application of HUD's reasonable relationship test to the fees received by the title agents. *See Hamilton*, 612 F.Supp.2d at 748-49; *Mims*, 521 F.Supp.2d at 573. *Hamilton* applies the reasonable relationship to simple overcharges, and it appears to hold that *O'Sullivan* supports this position. *See Hamilton*, 612 F.Supp.2d at 749-50. The court has already discussed that plaintiffs do not explicitly rely on a reasonable relationship analysis. *See supra* § III(B)(4). To the extent, however, that *Mims* and *Hamilton* support applying a reasonable relationship test in this case, and to the extent they would extend § 8(b) to cover overcharges, the court respectfully declines to follow them. *See supra* § III(B)(4) (explaining why HUD's reasonable relationship test and *O'Sullivan* are inapposite).

> unambiguous. So long as some work is
> performed by the recipient of the fee, or any
> portion thereof, RESPA Section 8(b) does not
> impose liability.

*Kingsberry*, 586 F.Supp.2d at 1247.

This court is not alone in concluding that RESPA § 8(b) is inapplicable in circumstances such as those on which plaintiffs rely in this case.

6

The court declines to conclude that RESPA § 8(b) is violated when a title insurer charges a premium in excess of a state's rate rules and then gives a portion of the premium to its title agent for services the title agent actually performed. Chicago Title is therefore entitled to summary judgment dismissing plaintiffs' RESPA claims.

IV

Chicago Title also moves for summary judgment dismissing plaintiffs' state-law claims for money had and received, unjust enrichment, and breach of implied contract.

Plaintiffs' state-law claims all rest on the same predicate. They maintain that they qualified for a reissue discount for lender title insurance when they refinanced their homes, and that Chicago Title failed, as mandated by Texas law, to discount the premiums. Plaintiffs assert that Chicago Title is liable for money had and received because it holds money in the nature of a debt that in equity belongs to plaintiffs; for unjust enrichment because it

wrongfully secured a benefit from plaintiffs; and for breach of implied contract because it breached an implied term that it would charge a lawful premium and give plaintiffs the refinance discount.

Chicago Title seeks summary judgment on several grounds. It contends as to all three claims that violations of the Texas Title Insurance Act, Tex. Ins. Code Ann. 2501.001 *et seq.* (Vernon 2009) ("TTIA"), do not give rise to private causes of action, and that the court lacks subject matter jurisdiction over the state-law claims because the TDI has exclusive jurisdiction, or, alternatively, that the court should defer to the TDI under the primary jurisdiction doctrine. Chicago Title also challenges the three state-law claims individually.

V

Chicago Title first contends that violations of the TTIA and the regulatory rules promulgated under it do not create private causes of action. Specifically, it argues that there is no private cause of action under the TTIA for charging a premium rate different from the one fixed by the Commissioner of the TDI ("Commissioner"). *See id.* § 2703.151 (prohibiting charging a premium rate different from the rate fixed by the Commissioner). Plaintiffs respond that they are not attempting to assert a private cause of action under the TTIA, but are only asserting the established common law claims of money had and received, unjust enrichment, and breach of implied contract.

The court rejected a previous version of Chicago Title's argument in *Hancock I*, in which it refused to dismiss Hancock's state-law claims. *See Hancock I*, 2008 U.S. Dist. LEXIS 8621, at *18-*19. The court assumed *arguendo* that there is no private cause of action for a violation of the TTIA, but it held that this conclusion did not affect Hancock's claims:

> Hancock has not attempted to assert a cause of action under the TTIA, but only alleges causes of action for money had and received, unjust enrichment, and violations of RESPA. Chicago Title cites no authority for the proposition that the mere absence of a cause of action under the TTIA would itself foreclose these other claims.

*Id.* at *19. Decisions by other judges of this court have reached the same conclusion, refusing to dismiss nearly identical common law claims.[16] *See Villafranca*, No. 3:08-CV-0118-K, slip op. at 1; *Mims*, 521 F.Supp.2d at 574; *Patino*, 2007 WL 4687748, at *7-*8. Chicago Title's renewed arguments notwithstanding, the court holds again that the mere absence of a cause of action under the TTIA does not foreclose plaintiffs from asserting these state-law claims.

_____

[16]Other district courts have also refused to dismiss common law claims where plaintiffs alleged that title insurers failed to give them a reissue discount mandated by state law. *See, e.g., Kingsberry v. Chi. Title Co.*, 586 F.Supp.2d 1248, 1249 (W.D. Wash. 2008); *Lewis v. First Am. Title Ins. Co.*, 2007 WL 2815041, at *2-*4 (D. Idaho Sept. 25, 2007) (allowing claims for breach of implied contract and unjust enrichment); *Randleman v. Fid. Nat'l Title Ins. Co.*, 465 F.Supp.2d 812, 817-27 (N.D. Ohio 2006) (allowing claims for breach of implied contract and unjust enrichment).

Chicago Title relies heavily on *Stewart Title Guaranty Co. v. Becker*, 930 S.W.2d 748 (Tex. App. 1996, writ denied), in which a Texas Court of Appeals refused to imply a private cause of action for violations of former Article 9.34 of the TTIA.[17]  *See Stewart Title*, 930 S.W.2d at 754-55.  Article 9.34 provided, *inter alia*, that "[n]o policy or contract of title insurance shall be written unless . . . there has been made a determination of insurability of title in accordance with sound title underwriting practices."  Tex. Ins. Code Ann. art. 9.34 (Vernon Supp. 1996) (repealed Apr. 1, 2005).  The *Stewart Title* court rejected the plaintiffs' argument that "a damage action exists to enforce Article 9.34, as a statutory cause of action under that statute, akin to a common-law action for negligence *per se* for violation of a statute."  *Stewart Title*, 930 S.W.2d at 754.  Although *Stewart Title* refused to fashion or imply a private cause of action for violation of this TTIA provision, it did not address whether established common law claims, such as the ones that plaintiffs assert, are precluded.

Chicago Title argues that plaintiffs' claims are common law in name only and are entirely premised on, and inextricably linked to, violations of the TTIA.  It is true that plaintiffs' state-law claims, along with their RESPA claims, rely on the premium rate

---

[17]The entire TTIA was recodified in 2005.  The changes were "intended as a recodification only, [with] no substantive change in law."  2003 Tex. Gen. Laws 1274, § 27.  As part of the 2005 recodification, Article 9.34 was renumbered as § 2704.001.

rules promulgated by the Commissioner, but it does not follow that this precludes the claims as a matter of law.  The state-law claims are recognized common law theories of liability, and plaintiffs have pleaded a factual basis for each.  As the court recognized in *Hancock I*, the absence of a statutory cause of action under the TTIA does not automatically preclude all common law claims that implicate the TTIA.  There must be some other bar to the court's hearing plaintiffs' state-law claims, such as a grant of exclusive jurisdiction to the TDI.

The cases Chicago Title cites to support the premise that plaintiffs cannot assert common law claims implicating the TTIA's rules are not inconsistent with the court's conclusion.  In *Texas Mutual Insurance Co. v. Eckerd Corp.*, 162 S.W.3d 261 (Tex. App. 2005, pet. denied), Texas Mutual sued several pharmacies, alleging that they overcharged for prescription drugs dispensed under the Texas Workers' Compensation Act ("TWCA").  *Id.* at 262-63.  The Pharmaceutical Fee Guideline, promulgated pursuant to the TWCA, set the maximum amounts that pharmacies could charge insurers for dispensed prescription drugs.  *Id.* at 263.  Texas Mutual asserted, *inter alia*, the common law claims for money had and received and negligent misrepresentation.  *Id.* at 264.  The court dismissed these claims *only after* concluding that the Texas Workers' Compensation Commission had exclusive jurisdiction over medical fee disputes.  *Id.* at 265-67 ("Because the Commission has exclusive

jurisdiction over this statutory provision and the claims that arise from it, Texas Mutual must exhaust its administrative remedies before bringing these claims in court.").

Similarly, in *Serna v. H.E. Butt Grocery Co.*, 21 S.W.3d 330 (Tex. App. 1999, no pet.), the Texas Court of Appeals dismissed a common law fraud claim that was based on an excessive sales tax charge. *Id.* at 335-36. *Serna* held that the trial court lacked jurisdiction over the claim because the Texas Tax Code provided the exclusive remedy for a tax overcharge, and the plaintiffs failed to exhaust their administrative remedies. *Id.* (holding that "[t]he Texas Tax Code affords an aggrieved taxpayer the only means for claiming or suing for a refund of overcharged sales tax").

In *Texas Medical Ass'n v. Aetna Life Insurance Co.*, 80 F.3d 153 (5th Cir. 1996), the Fifth Circuit held that physicians who were terminated from participation in a preferred provider organization ("PPO") could not sue to enforce privately the administrative PPO rules. *Id.* at 156-57 (applying Texas law). It held that the PPO rules established that (former) Texas Insurance Code Article 21.21-2 was the *exclusive* enforcement mechanism for the rules, and that the plaintiffs' attempt to assert a declaratory judgment concerning contract rights was merely an attempt to circumvent the prescribed administrative procedures. *Id.* at 158-59.

Chicago Title cites title insurance cases decided by other

federal district courts, but they rely on aspects of their respective states' administrative schemes that do not apply to the TTIA.   In *Hazewood* the court dismissed common law claims for declaratory judgment, unjust enrichment, and price discrimination, relying on a provision of the Alabama Title Insurance Act that provided: "This chapter shall be enforceable only by the commissioner and does not create any private cause of action or other private legal recourse."   Ala. Code 1975 § 27-25-9(b); *Hazewood*, 2007 WL 1975446, at *6.   Notably, the TTIA contains no similar provision.   The District of Maryland also dismissed common law claims, including one for money had and received, but it relied on Maryland precedent that a plaintiff must exhaust the administrative remedies provided by the Maryland Insurance Code before bringing a civil action in court.   *See Arthur v. Ticor Title Ins. Co. of Fla.*, Civil No. AMD 07-1737, slip op. 5-8 (D. Md. Mar. 11, 2008), *aff'd*, ___ F.3d ___, 2009 WL 1703151 (4th Cir. June 18, 2009).

Thus none of the cases Chicago Title cites demonstrates that the absence of a statutory cause of action for a violation of the TTIA would itself preclude plaintiffs' state-law claims.

VI

Chicago Title argues that the court lacks subject matter jurisdiction over the state-law claims because the TDI has

- 31 -

exclusive jurisdiction,[18] and that plaintiffs did not exhaust their administrative remedies.

A

Under Texas law, which controls here, it is presumed that district courts have the authority to resolve disputes unless the state constitution or another law confers exclusive jurisdiction on another court or an administrative agency. *See In re Sw. Bell Tel. Co., L.P.*, 235 S.W.3d 619, 624 (Tex. 2007). "An agency has exclusive jurisdiction when the Legislature gives the agency alone the authority to make the initial determination in a dispute." *Cash Am. Int'l Inc. v. Bennett*, 35 S.W.3d 12, 15 (Tex. 2000). The authority can be bestowed on an agency by an "express legislative indication" of exclusive jurisdiction. *See Thomas v. Long*, 207 S.W.3d 334, 340 (Tex. 2006). An agency is also held to have exclusive jurisdiction "when a pervasive regulatory scheme indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *In re Sw. Bell*, 235 S.W.3d at 624-25 (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex. 2002)). Whether an agency has exclusive jurisdiction is a matter of statutory interpretation and a question

---

[18]The court refused to consider this argument in deciding Hancock's motion to dismiss because Chicago Title raised it for the first time in its reply brief. *See Hancock I*, 2008 U.S. Dist. LEXIS 8621, at *19 n.4.

of law for the court to decide. *See Subaru of Am.*, 84 S.W.3d at 222. "Typically, if an agency has exclusive jurisdiction, a party must exhaust all administrative remedies before seeking judicial review of the agency's action." *Id.* at 221. "When exhaustion is required, courts have only limited review of the administrative action." *Id.* In other words, when an agency has exclusive jurisdiction, the court's role is limited to performing judicial review of the agency action.

B

The Texas Legislature has mandated that the TDI regulate the business of insurance in Texas and ensure that the Texas Insurance Code is executed. Tex. Ins. Code Ann. § 31.002 (Vernon 2009). The Commissioner is the chief executive of the TDI and the administrative officer, and is explicitly given the power to administer and enforce the Insurance Code. *Id.* § 31.021(a).

Title 11 of the Insurance Code, known as the TTIA, specifically governs the business of title insurance in Texas. The stated purpose of the TTIA "is to completely regulate the business of title insurance on real property . . . including the direct issuance of policies and the reinsurance of any assumed risks, to . . . protect consumers and purchasers of title insurance policies [and] provide adequate and reasonable rates of return for title insurance companies and title insurance agents." *Id.* § 2501.002(a). And "[i]t is the express legislative intent that

[the TTIA] accomplish [this] purpose." *Id.* § 2501.002(b).  As part of the regulation of title insurance, the TTIA provides that, with the exception of premiums for reinsurance between title insurance companies, "the commissioner shall fix and promulgate the premium rates to be charged . . . for title insurance policies," and that "a premium may not be charged for a title insurance policy . . . at a rate different from the rate fixed and promulgated by the commissioner." *Id.* § 2703.151.  The Commissioner has set forth the premium rate structure in Section III of the Basic Manual of Rules, Rates and Forms for the Writing of Title Insurance in the State of Texas (the "Basic Manual").  *See* D. Dec. 10, 2008 App. 53-76; *see also* 28 Tex. Admin. Code § 9.1 (2009) (adopting the Basic Manual).  Rate rule "R-8" provides the discounted premium rates for reissue policies.

In enforcing the TTIA, the Commissioner audits title insurers.  *See* D. Dec. 10, 2008 App. 77 (stating that the goal is to "comprehensively audit every agent at least once every three years").  The audits include an inquiry into whether the title insurer charged an incorrect premium, and specifically whether a refinance credit was not given or was calculated incorrectly, in violation of R-8.  If a title insurer "charges any premium rate . . . other than a premium rate prescribed by the commissioner," it forfeits the right to engage in business in Texas.  Tex. Ins. Code Ann. § 2551.351(a) (Vernon 2009).  When the Commissioner determines

that a title insurer has violated the TTIA, the Commissioner notifies the insurer that it has 30 days to comply with the title. If the insurer does not comply, the Commissioner must revoke the insurer's certificate of authority. *Id.* § 2551.353. The Commissioner also has the authority to impose other sanctions for Insurance Code violations, including suspending an insurer's certificate of authority, ordering an insurer to cease and desist from violations, imposing an administrative penalty, and directing an insurer to make restitution. *Id.* § 82.052.[19] The Insurance Code explicitly provides that the Commissioner may direct an insurer "to make complete restitution to each Texas resident, each Texas insured, and each entity operating in this state that is harmed by a violation of, or failure to comply with, this code or a rule of the commissioner." *Id.* § 82.053(a).

If a title insurer is aggrieved by an action of the Commissioner, it "may file an appeal of the commissioner's action in a district court in Travis County." *Id.* § 2551.354(a). The action is then reviewed under the substantial evidence rule. *See id.* § 2551.354(c). Although the TTIA only addresses appeals by title insurers, it incorporates § 36.202 of the Insurance Code, which provides: "After failing to get relief from the commissioner, any insurance company or other party at interest who is

---

[19]The TTIA provides that Chapter 82 of the Insurance Code applies to title insurers. Tex. Ins. Code Ann. § 2551.001(c) (Vernon 2009).

dissatisfied with an action of the commissioner may file a petition for judicial review against the commissioner as defendant." *Id.* § 36.202. The petition must be filed in a district court in Travis County, and judicial review is pursuant to the substantial evidence rule. *Id.* §§ 36.202–.203. An "action" subject to judicial review includes "a decision, order, rate, rule, form, or administrative or other ruling of the commissioner." *Id.* § 36.201.

The TTIA neither explicitly provides nor explicitly prohibits a private cause of action for damages caused by a violation of the TTIA or the rules promulgated thereunder. It does authorize, however, private actions by persons who have been damaged by enumerated unfair methods of competition or unfair or deceptive acts or practices. *Id.* § 541.151; *see also id.* § 2551.001(c) (providing that Chapter 541 applies to title insurers). The TTIA also authorizes class actions by individuals damaged by an enumerated deceptive trade practice. *See id.* § 541.251. Plaintiffs do not bring a claim under Chapter 541 and do not allege an enumerated unfair or deceptive act or practice.

C

Chicago Title briefly argues that the Texas Legislature enacted as part of the TTIA an express indication of exclusive jurisdiction. It relies on § 2501.002, which provides:

> The purpose of this title is to completely
> regulate the business of title insurance on
> real property . . . including the direct
> issuance of policies and the reinsurance of
> any assumed risks, to . . . protect consumers
> and purchasers of title insurance policies
> [and] provide adequate and reasonable rates of
> return for title insurance companies and title
> insurance agents.

*Id.* § 2501.002(a). Section 2501.002 also states that "[i]t is the express legislative intent that [the TTIA] accomplish [this] purpose." *Id.* § 2501.002(b).

Neither this section nor any other part of the TTIA contains an express legislative indication that the TDI or the Commissioner has exclusive jurisdiction over plaintiffs' state-law claims. Stating that the purpose of the TTIA is to "completely regulate" the business of title insurance is not the same as granting the TDI "exclusive jurisdiction" over the instant disputes. Notably, the section does not mention the TDI's jurisdiction at all, much less the matter of exclusive jurisdiction. *Cf. In re Entergy Corp.*, 142 S.W.3d 316, 323 (Tex. 2004) (holding that Public Utility Commission ("PUC") had exclusive jurisdiction where Public Utility Regulatory Act provided that PUC "has exclusive original jurisdiction over the rates, operations, and services of an electric utility"); *Subaru of Am.*, 84 S.W.3d at 219, 223 (holding that Texas Motor Vehicle Board had exclusive jurisdiction where Texas Motor Vehicle Commission Code provided that Board "has the exclusive, original jurisdiction to regulate those aspects of the distribution, sale, and leasing of

motor vehicles as governed by this Act"). And the TTIA nowhere discusses jurisdiction over, or a procedure for, resolving a dispute between a consumer and a title insurer. Chicago Title has cited no Texas decision that held that an agency had exclusive jurisdiction under a statute that did not even mention jurisdiction.

Moreover, were the court to agree with Chicago Title, claims brought under the remedial scheme established by the TTIA would be assertable in a court, if assertable at all, only in a district court in Travis County, and that tribunal's involvement would be confined to judicial review under the deferential substantial evidence rule. This court will not deprive litigants of a remedy provided by the TTIA on so slim a reed as the text of § 2501.002, including the Legislature's stated intention that the TTIA completely regulate the business of title insurance on real property.

D

Legislative intent to grant exclusive jurisdiction over a dispute can also be demonstrated by a "pervasive regulatory scheme." *See Thomas*, 207 S.W.3d at 340. The court thus looks to the TTIA's regulatory scheme to determine if the Texas Legislature intended the Commissioner to have the sole authority to make the initial determination in the rate dispute between plaintiffs and Chicago Title.

- 38 -

Although the TTIA is intentionally comprehensive in its regulation of the title insurance business, the scheme lacks the following critical element that prevents the court from concluding that the Commissioner has exclusive jurisdiction in this case: an administrative procedure through which consumers, like plaintiffs, can dispute the rates they have been charged by title insurers. When an administrative body has exclusive jurisdiction over a dispute, a party must exhaust its administrative remedies before seeking judicial review. The TTIA, however, provides no administrative procedure through which plaintiffs could pursue their claims or seek remedies.

The TTIA mandates that the Commissioner set the premium rates to be charged for title insurance, and it prohibits title insurers from straying from the fixed rates. Tex. Ins. Code Ann. § 2703.151. If a title insurer charges a premium rate other than the rate set by the Commissioner, it forfeits the right to engage in business in Texas. *Id.* § 2551.351(a). If the Commissioner determines that a title insurer has violated the TTIA, the Commissioner notifies the insurer that it has 30 days to comply with the title, and if it does not comply, the Commissioner must revoke the insurer's certificate of authority. *Id.* § 2551.353. The Insurance Code also authorizes the Commissioner to impose other sanctions, including awarding restitution, for violations of the Code. *Id.* § 82.052. If a title insurer is aggrieved by an action

of the Commissioner, it may appeal the action by seeking judicial review in a district court in Travis County.  *Id.* § 2551.354(a). The TTIA thus focuses on regulating and sanctioning title insurers; it does not address the resolution of consumer disputes.

Chicago Title points to the Commissioner's practice of auditing title insurers as evidence of a pervasive regulatory scheme.  It is undisputed that the Commissioner is charged with enforcing the TTIA's rules and does so through audits and occasional sanctions.  *See* D. Dec. 10, 2008 App. 77-106 (audit reports).  The fact that a title insurer is audited approximately once every three years, however, does not indicate that the Commissioner has sole authority to resolve the dispute at the heart of plaintiffs' claims of money had and received, unjust enrichment, and breach of implied contract.  In some instances, the TDI may uncover a rate rule violation during an audit, and may even sanction the insurer or provide restitution to the victim, but this possibility does not mean that the Texas Legislature intended to deprive an overcharged consumer of the ability to pursue a common law claim against the insurer.  There is no indication, and Chicago Title does not argue, that a consumer has a right to initiate an audit or other investigation.  This triennial audit provides no means for a consumer to resolve a dispute or seek a remedy.

Chicago Title contends that private parties may petition the Commissioner to remedy violations of the TTIA by submitting a

complaint.   It then points to a complaint form available on the TDI's website.   *See id.* at 107-15.   This form is a general TDI complaint form that can be submitted to its Consumer Protection section.   Chicago Title appears to contend that plaintiffs could have exhausted their administrative remedies by submitting this form.   But this general complaint form cannot function in the manner that Chicago Title contends.   There is no mention of the complaint form, or any complaint procedure, in the TTIA as a means of obtaining legal relief, and Chicago Title has not pointed to any mention in the Insurance Code of a complaint procedure that serves this function.   Chicago Title has also failed to explain how complaint forms are reviewed, or if there is an established procedure for responding to or investigating complaints that results in a reviewable decision.   It certainly does not provide evidence that a complainant has a right to have a complaint investigated or to receive any decision at all.   Chicago Title contends that a complainant can seek judicial review if a complaint is not dealt with satisfactorily, asserting that "[i]f the party is 'dissatisfied with an action of the commissioner[,]' the party 'may file a petition for judicial review' in state court in Travis County."   D. Dec. 10, 2008 Br. 7 (quoting Tex. Ins. Code Ann. § 36.202).   The Insurance Code provides that "[a]n action of the commissioner subject to judicial review under this subchapter includes a decision, order, rate, rule, form, or administrative or

- 41 -

other ruling of the commissioner." Tex. Ins. Code Ann. § 36.201.
But Chicago Title has not shown that a decision made in response to
a complaint form is considered under Texas law to be an "action of
the commissioner" for which judicial review is available under
§ 36.201. So far as the record shows, the complaint form is simply
a way by which the TDI solicits consumer input that may enable it
to resolve complaints informally, and perhaps to gather information
that will enable it to initiate investigations or other agency
action if consumer complaints so warrant. Chicago Title has not
shown, and the court has not found, any procedure through which
persons can seek the Commissioner's resolution of their disputes or
can exhaust their administrative remedies.

The absence of such an administrative procedure becomes
particularly conspicuous when the court examines the regulatory
schemes that Texas courts have found to create exclusive
jurisdiction. In *In re Southwestern Bell Telephone Co.* the Supreme
Court of Texas held that the Public Utility Regulatory Act ("PURA")
was intended to serve as a pervasive regulatory scheme, so that the
PUC had exclusive jurisdiction over the plaintiffs' billing
dispute. *In re Sw. Bell*, 235 S.W.3d at 625. In analyzing PURA's
regulatory scheme, the court observed that, "[f]or billing
disputes, the PUC's authority is even more comprehensive, as it may
'resolve disputes between a retail customer and a billing utility,
service provider, [or] telecommunications utility.'" *Id.* at 625–26

- 42 -

(quoting Tex. Util. Code Ann. § 17.157(a)).   PURA also provides that the PUC "shall adopt procedures for the resolution of disputes in a timely manner, which in no event shall exceed 60 days."   Tex. Util. Code Ann. § 17.157(c) (Vernon 2007).

A Texas Court of Appeals recently held that the Texas Tax Code "is a classic example of a pervasive regulatory scheme, evidencing a legislative intent to vest the appraisal review boards with exclusive jurisdiction" over tax appraisal disputes.   *Appraisal Review Bd. of Harris County Appraisal Dist. v. O'Connor & Assocs.*, 267 S.W.3d 413, 416-17 (Tex. App. 2008, no pet.); *see also Serna*, 21 S.W.3d at 335-36 (holding that the "Tax Code affords an aggrieved taxpayer the only means for claiming or suing for a refund of overcharged sales tax").   The court stated that "[t]he Tax Code sets forth administrative procedures for aggrieved property owners to protest their tax liabilities," and it discussed the detailed administrative procedures.   *Appraisal Review Bd.*, 267 S.W.3d at 417 (citing Tex. Tax Code Ann. chs. 41-42 (Vernon 2008)).

The Texas Workers' Compensation Act has also been held to constitute a pervasive regulatory scheme demonstrating the Legislature's intent to grant the Workers' Compensation Commission exclusive jurisdiction over medical fee disputes.   *See Tex. Mut. Ins.*, 162 S.W.3d at 265-66; *Howell v. Tex. Workers' Comp. Comm'n*, 143 S.W.3d 416, 436-37 (Tex. App. 2004, pets. denied).   Both opinions rely heavily on the fact that the act "established

mandatory reimbursement procedures and a system implemented by the Commission to review and resolve medical fee disputes." *Tex. Mut. Ins.*, 162 S.W.3d at 265; *see also Howell*, 143 S.W.3d at 436-37. *Texas Mutual Insurance* also observes that "[t]hese procedures expressly condition a party's access to the courts on first exhausting its administrative remedies." *Tex. Mut. Ins.*, 162 S.W.3d at 265 (citing Tex. Labor Code Ann. § 413.031(k)).

Unlike these regulatory schemes that Texas courts have held create exclusive jurisdiction, the TTIA provides no procedures through which plaintiffs can seek resolution of this rate dispute. If the Texas Legislature intended the Commissioner to have exclusive jurisdiction over a dispute between a consumer and a title insurer concerning the premium the consumer was charged, as Chicago Title argues, it should be expected that the TTIA would speak to this in some indubitable way. The court concludes that the TTIA does not grant the TDI exclusive jurisdiction over plaintiffs' dispute. The TTIA does not contain an express indication of exclusive jurisdiction, and there is nothing in the regulatory scheme indicating that the Legislature intended for the TDI to have sole authority to make the initial determination in the dispute. Thus the court has subject matter jurisdiction over the state-law claims.

E

Chicago Title argues that, even if the court has subject matter jurisdiction over the state-law claims, it should refrain from exercising it under the primary jurisdiction doctrine.

"The judicially-created primary jurisdiction doctrine operates to allocate power between courts and agencies when *both* have authority to make initial determinations in a dispute." *Subaru of Am.*, 84 S.W.3d at 221. Under this doctrine, courts should defer to an administrative agency and allow it to make the initial determination in a dispute when: "(1) the agency is staffed with experts trained in handling complex problems within the agency's purview, and (2) great benefit is derived from the agency's uniform interpretation of laws within its purview and the agency's rules and regulations when courts and juries might reach differing results under similar fact situations." *Tex. Dep't of Ins. v. Reconveyance Servs., Inc.*, 240 S.W.3d 418, 432 (Tex. App. 2007, pet. filed).

The court holds that the primary jurisdiction doctrine does not support deferring to the TDI in this case. First, as a practical matter, there is no administrative procedure through which plaintiffs could seek an initial determination from the TDI concerning the excessiveness of the premium rates they were charged. *See supra* VI(D) (discussing absence of administrative procedure for resolution of plaintiffs' dispute); *Reconveyance*

- 45 -

*Servs.*, 240 S.W.3d at 432 (holding that primary jurisdiction doctrine did not apply because of absence of administrative proceeding through which plaintiff could obtain determination from agency).   Second, the state-law claims do not present complex problems within the TDI's purview, and there is no special danger of inconsistent application of the rate rules.   Title insurers calculate premiums using the rate rules every time they issue a title insurance policy, and there is no reason the court could not apply them in this case if the need arises.

VII

The court now turns to the grounds on which Chicago Title relies to seek summary judgment dismissing plaintiffs' state-law claims on the merits.

Chicago Title argues that Texas law does not afford an independent cause of action for unjust enrichment.   It contends that unjust enrichment is a theory of liability that a plaintiff can pursue through several equitable causes of action, including money had and received, but not as a separate and distinct claim. This court, along with others in the Fifth Circuit, has previously agreed with this characterization of Texas law.   *Redwood Resort Props., LLC v. Holmes Co.*, 2006 WL 3531422, at *9 (N.D. Tex. Nov. 27, 2006) (Fitzwater, J.) (dismissing unjust enrichment claim and holding that it is not an independent cause of action) (citing *Doss v. Homecoming Fin. Network, Inc.*, 210 S.W.3d 706, 709 n.4 (Tex.

App. 2006, pet. denied)); *see also Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) ("Money had and received is an equitable doctrine applied to prevent unjust enrichment." (quoting *Miller-Rogaska, Inc. v. Bank One, Tex., N.A.*, 931 S.W.2d 655, 662 (Tex. App. 1996, no pet.))); *Merrill Lynch, Pierce, Fenner & Smith, P.C. v. Greystone Servicing Corp.*, 2007 WL 2729935, at *12 (N.D. Tex. Sept. 18, 2007) (Solis, J.) (explaining that "[a]nother basis for recovering under the theory of unjust enrichment is when a claim for 'money had and received' has been established"); *Wood v. Gateway, Inc.*, 2003 WL 23109832, at *12 (N.D. Tex. Dec. 12, 2003) (Cummings, J.) (dismissing unjust enrichment claim as not an independent cause of action).   Moreover, Texas courts of appeals have consistently held that unjust enrichment is not an independent cause of action, but is instead a theory upon which an action for restitution may rest.[20]   *See, e.g.*, *Argyle Indep. Sch. Dist. v. Wolf*, 234 S.W.3d 229, 246-47 (Tex. App. 2007, no pet.); *Friberg-Cooper Water Supply Corp. v. Elledge*, 197 S.W.3d 826, 831-32 (Tex. App. 2006, pet. granted) (treating unjust enrichment claim as a claim for money had and received), *rev'd on other grounds*, 240 S.W.3d 869 (Tex. 2007); *Mowbray v. Avery*, 76 S.W.3d 663, 680 (Tex.

---

[20]"Although an intermediate appellate court decision is not controlling where the highest state court has not spoken on the subject, [the court] ordinarily defer[s] to the holdings of lower appellate courts in the absence of guidance from the highest court." *Holden v. Connex-Metalna Mgmt. Consulting GmbH*, 302 F.3d 358, 364-65 (5th Cir. 2002) (internal quotation marks omitted).

App. 2002, pet. denied).

It is true, as plaintiffs point out, that the Supreme Court of Texas and other courts still occasionally refer to an "unjust enrichment claim." *See, e.g.*, *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869 (Tex. 2007); *HECI Exploration Co. v. Neel*, 982 S.W.2d 881 (Tex. 1998). These opinions do not, however, characterize unjust enrichment as a separate cause of action from money had and received; they consider it to be a general theory of recovery for an equitable action seeking restitution. As one court of appeals explained in *Mowbray*:

> Although the [Supreme Court of Texas] in *HECI* refers to "the cause of action" of unjust enrichment, it also refers to unjust enrichment as a "remedy," "basis for recovery" and speaks of a "cause of action *based on*" unjust enrichment. We do not see these statements as recognition of unjust enrichment as an independent cause of action, but simply as a reiteration of the well established principle that a suit for restitution may be raised against a party based on the theory of unjust enrichment.

*Mowbray*, 76 S.W.3d at 680 n.25 (internal citation omitted). This court agrees with *Mowbray's* interpretation. Plaintiffs have cited no cases in which the Supreme Court of Texas has recognized a claim for unjust enrichment as independent from an action for money had and received, and the court concludes Texas law indicates that they are not separate and independent claims.

In the present case, plaintiffs' claims for unjust enrichment and money had and received essentially seek restitution of the

reissue discount, and both are based on the equitable principle of preventing unjust enrichment. Because Texas law does not afford an independent cause of action for unjust enrichment, plaintiffs cannot simultaneously maintain both of these claims. The court therefore grants summary judgment dismissing plaintiffs' unjust enrichment claims.

## VIII

Chicago Title seeks dismissal of plaintiffs' breach of implied contract claims. Its arguments focus on the express contract between itself and plaintiffs' lenders. Plaintiffs allege, however, that they personally entered into implied contracts with Chicago Title under which it was obliged to charge them a lawful premium. The court finds that a reasonable jury could find that plaintiffs and Chicago Title entered into implied contracts.[21] Thus plaintiffs' breach of implied contract claims survive Chicago Title's summary judgment motion.

## IX

Chicago Title also moves for summary judgment on the ground that Hancock's claims fail for reasons particular to his factual

---

[21]When this court denies rather than grants summary judgment, it typically does not set out in detail the evidence that creates a genuine issue of material fact. *See, e.g.*, *Swicegood v. Med. Protective Co.*, 2003 WL 22234928, at *17 n.25 (N.D. Tex. Sept. 19, 2003) (Fitzwater, J.).

allegations.[22]

A

The factual allegation underpinning all of Hancock's claims——both the state-law claims and the federal RESPA claim——is that Chicago Title charged him an excessive premium by failing to give him the reissue discount mandated by Texas law. Chicago Title argues that Hancock was not charged an excessive title insurance premium, and that all of his claims should accordingly be dismissed. It posits that no genuine issue of material fact remains as to whether Hancock was overcharged. Chicago Title also raises several affirmative defenses that it contends prevent Hancock from maintaining claims based on the alleged overcharge. Hancock responds that the summary judgment record contains ample evidence raising a material fact issue concerning the alleged excessive premium, and that Chicago Title has not met its summary judgment burden as to its affirmative defenses.

---

[22]In its reply brief, Chicago Title argues in passing that Benavides' claims are now moot because its title agent sent her a refund, which constituted an unconditional tender. The court declines to consider this argument, because Chicago Title has raised it for the first time in its reply brief. *See, e.g.*, *Weber v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 455 F.Supp.2d 545, 551 (N.D. Tex. 2006) (Fitzwater, J.). Moreover, Chicago Title has not attempted to show how this alleged refund, which was sent after Chicago Title filed its motion for summary judgment and which Benavides rejected, moots her claims.

B

Because Chicago Title does not have the burden at trial on Hancock's claims, it can meet its summary judgment obligation by pointing the court to the absence of evidence to support the claims. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). In its motion, Chicago Title has pointed to the absence of evidence supporting Hancock's allegation that he was not given the reissue discount mandated under Texas law. Because it has done so, Hancock must go beyond his pleadings and designate specific facts showing that there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in Hancock's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Hancock's failure to produce proof as to any essential element renders all other facts immaterial. *See Trugreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if Hancock fails to meet this burden. *Little,* 37 F.3d at 1076.

But Hancock has met his burden. The original HUD-1, signed by Hancock on March 9, 2007, indicates that he was overcharged for his title insurance policy. And on September 20, 2007, after this litigation had commenced, Hancock received a letter from Susan Scott ("Scott"), an employee of Chicago Title's title agent. The

letter, on Chicago Title's letterhead, reads:

> After a recent audit of our file, we found you were due a refund from a calculation error in your premium amount.  Attached is a revised HUD for your signature and an envelope, postage prepaid for your use in returning this to our office.  Attached is our check in the amount of $333.55.
>
> Thank you and if you have any questions, please contact our office.

D. July 23, 2008 App. 42.

A revised HUD-1 and a check bearing the names of Chicago Title and its title agent were enclosed with the Scott letter.  The revised HUD-1 indicates that the title insurance charge paid to Chicago Title was $727.80, which is $333.55 less than the $1,061.35 charge in the original HUD-1.  Despite Chicago Title's evidence to the contrary,[23] the original HUD-1 and the Scott letter provide sufficient evidence for a reasonable jury to conclude that Chicago Title overcharged Hancock.

C

To be entitled to summary judgment on its affirmative defenses, for which it will have the burden of proof at trial, Chicago Title "must establish 'beyond peradventure all of the essential elements of the . . . defense[s].'" *Bank One, Tex., N.A. v. Prudential Ins. Co. of Am.*, 878 F. Supp. 943, 962 (N.D. Tex.

---

[23]This evidence includes two additional HUD-1 forms.  One is unsigned by Hancock, and Hancock alleges that the other was altered.  Hancock asserts that he was never presented with either of these additional HUD-1 forms.

1995) (Fitzwater, J.) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)).  The court has noted that the "beyond peradventure" standard is "heavy."  *See, e.g., Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2007 WL 2403656, at *10 (N.D. Tex. Aug. 23, 2007) (Fitzwater, J.).

Chicago Title's affirmative defenses all are based on the same premise: that, upon cashing the refund check enclosed in the Scott letter, Hancock accepted the revised HUD-1 and relinquished his claims.  Chicago Title essentially casts the Scott letter as a settlement offer that Hancock accepted by cashing the check.

The pertinent facts contained in the summary judgment record are brief.  Hancock filed this lawsuit on August 22, 2007.  After receiving the Scott letter, which is quoted above, Hancock cashed the refund check on September 25, 2007.  There is no evidence that Hancock signed or returned the revised HUD-1.  On August 28, 2008 Hancock sent Scott a letter and a check payable to Chicago Title Insurance Company, FNAS Division, in the amount of $333.55.  The letter stated:

> By letter dated September 20, 2007, you sent me a check for $333.55.  I did not understand what it was for at the time.  It has come to my attention that Chicago Title Insurance Company has recently taken the position that the check was an effort to settle or dispose of my claims against Chicago Title in a pending lawsuit.  I did not agree to settle or release any such claims.  Accordingly, enclosed is a check #6839 in the amount of $333.55, payable to Chicago Title Insurance Company, FNAS Division.

P. Oct. 30, 2008 App. 151. Hancock also testified in his deposition that he did not have a clear understanding of why he was receiving the refund check and that he had no intention of settling his claims against Chicago Title.

Chicago Title first contends that Hancock is contractually bound to the terms of the revised HUD-1 because the parties entered into a settlement agreement. It argues that the Scott letter, combined with the revised HUD-1 and the refund check, constituted an offer to settle Hancock's claims against Chicago Title, and that Hancock accepted the settlement offer by cashing the check. The court need not address this assertion at length. Nothing in the Scott letter or the enclosed documents alludes to Hancock's claims against Chicago Title or the present litigation, much less an intent on the behalf of Chicago Title to settle those claims. Moreover, the Senior Vice President of Chicago Title's title agent, Michele W. Jorgensen ("Jorgensen"), stated in her declaration that the decision to send the reimbursement check was hers alone, and that it was sent "in an effort to maintain customer goodwill." D. July 23, 2008 App. 23. In her deposition, Jorgensen likewise testified that the reimbursement check was sent as a gesture of customer goodwill. She acknowledged that she "was not attempting to settle anything." P. Oct. 30, 2008 App. 141. Chicago Title has not established beyond peradventure that the Scott letter constituted an offer to settle Hancock's claims, much less one that

Hancock understood and accepted.

Second, Chicago Title asserts that the doctrine of quasi-estoppel precludes Hancock from alleging that he was overcharged. "Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id.* Chicago Title argues that Hancock cannot now allege that he was overcharged, because this allegation contradicts the position he took by accepting the reimbursement offer. As indicated above, it is far from clear whether the Scott letter constituted some type of "offer" capable of binding Hancock. And Chicago Title certainly has not established beyond peradventure that Hancock took a position concerning the revised HUD-1, much less one that is inconsistent with his allegation that he was overcharged.

Third, Chicago Title posits that Hancock waived his claims by cashing the refund check. In Texas, "[w]aiver requires intent, either the 'intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'" *In re Gen. Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (quoting *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987)). Chicago Title has not established waiver. It has provided

no evidence that Hancock intended to relinquish his claims, and, given the ambiguity of the Scott letter and the circumstances surrounding it, Hancock's cashing of the refund check was not clearly inconsistent with his right to pursue this action.

Accordingly, Chicago Title is not entitled to summary judgment on any of its affirmative defenses relating to Hancock's claims.

*       *       *

For the foregoing reasons, the court grants in part and denies in part Chicago Title's July 23, 2008 motion for summary judgment, which seeks dismissal of Hancock's claims.   It grants summary judgment dismissing Hancock's RESPA § 8(b) claim and his unjust enrichment claim.   It denies summary judgment as to his claims for money had and received and breach of implied contract.   Similarly, the court grants in part and denies in part Chicago Title's December 10, 2008 motion for summary judgment seeking dismissal of Benavides' claims.   It grants summary judgment dismissing Benavides' RESPA § 8(b) claim and her unjust enrichment claim.   It denies summary judgment as to her claims for money had and received and breach of implied contract.   The court denies Chicago Title's December 5, 2008 motion for leave to file supplemental appendix in

support of summary judgment reply *nunc pro tunc*.  The court grants
Chicago Title's June 22, 2009 motion for leave to file notice of
supplemental authority.  *See supra* note 8.

     **SO ORDERED.**

July 9, 2009.


_____
SIDNEY A. FITZWATER
CHIEF JUDGE